May 16, 1904.

———— o ————

No. 3330.

(Court of Appeal, Parish of Orleans)

## JACOB K. HIRSCH, ASSIGNEE vs. NEW HAMPSHIRE FIRE INSURANCE COMPANY OF MANCHESTER.

1. Usages and customs may be admitted to effect insurance contracts as is allowed in other contracts; the principle upon which evidence of same is received, is that the parties to the policy are supposed to have contracted with reference to them.

2. Every usage of a particular trade which is well settled or so generally known that all persons engaged in that trade may be fairly considered as contracting with reference to it, is considered to form part of every policy designed to protect risks in such trade, unless the express terms of the policy decisively repel the inference.

3. The usage must be either a general usage of the whole mercantile world, or a particular usage of universal notoriety in the trade upon which, and of the place at which the insurance is effected.

4. The usage of a particular place or a particular class of persons cannot be binding on non-residents or on any person unless they are shown to have been cognizant of it.

5. When the defense in a suit on a policy of fire insurance is non-compliance with the iron safe clause in that the books of the insured did not contain a record of all his purchases and that he did not have his books in his iron safe on the night when the fire occurred which destroyed the books as well as the property insured; and where the evidence is that the insured had received in his store several lots of goods at periods from three months to within a few days of the fire which he had not entered in his

215

books, his excuse therefor being that he does not enter purchases on his books until the goods are opened and checked up and that these goods were not opened and checked up; and where the books were left exposed on his desk on the night of the fire and whilst the store was not open for business, his reason for not having put them in his iron safe being that he was working on them the evening preceding the night of the fire; that he was suddenly taken ill; that he left the store for his home to take medicine; that he intended to return; that he took an ov-dose of medicine and fell asleep and did not wake up until the alarm of fire was sounded that night or early the next morning : *Held*, that a breach of the express promissory warranty is shown and that there can be no recovery even under the doctrine of substantial compliance, if such doctrine obtains in this State.

Appeal from Civil District Court, Division A.

H. L. Lazarus, for Plaintiff and Appellee.

W. B. Spencer, for Defendant and Appellant.

MOORE, J.   This was a suit on a policy of fire insurance.

The defense is non compliance with the "Iron Safe Clause."

There was judgment in favor of the plaintiff for the full amount of the policy and the defendant appeals.

It appears that on the 3rd. of July 1901, H. C. McCall, who was then carrying on a general merchandise store in the town of Wilson in this State insured in the defendant Company his stock of merchandise for $1500, the store building for $300 and the store fixtures for $100, all under cover of one policy, these several items, however, being specifically indicated as the properties covered and for the specific amounts stated.

Between midnight of the 2nd. of October, 1901 and 4 o'clock of the morning of the following day, the hour not being definitely fixed, a fire occurred in the premises of the insured which totally destroyed the property covered by the policy and all the commercial books kept by the insured the latter having been left out of the iron safe on the night of the fire.

On the 27th. of December, 1901, McCall assigned his interest in the policy to the plaintiff "for the benefit of his (McCall's) creditors," and the suit was brought in the said assignee.

The iron safe clause, the non-compliance with which on the part of the insured is urged as a defense to the suit is as follows :

216

"The following covenant and warranty is hereby made a part of this policy :

"1. The assured will take a complete itemized inventory of of stock on hand at least once in each calendar year, and unless such inventory has been taken within twelve calendar months prior to the date of.this policy, one shall be taken in detail within thirty days of issuance of this policy, or this policy shall be null and void from such date.

"2. The assured will keep a set of books, which shall clearly and plainly present a complete record of business transacted, including all purchases, sales and shipments, both for cash and credit, from date of inventory as provided for in first section of this clause and also from date of last preceding inventory, if such has been taken, and during the continuance of this policy.

"3. The assured will keep such books and inventory and also the last preceding inventory, if such has been taken, securely locked in a fire-proof safe at night, and at all times when the building mentioned in this policy is not actually open for business, or failing in this, the assured will keep such books and inventories in some secure place not exposed to a fire which would destroy the aforesaid building; and unless such books and inventories are produced and delivered to this Company for examination after loss and damage by fire to the personal property insured hereunder, this policy shall be null and void and no suit or action shall be maintained hereon. It is further agreed that the receipt of such books and inventories and the examination of the same shall not be an admission of any liability under the policy nor a waiver of any defense to same.'

The testimony of the insured, (McCall) and he is the only witness who testifies to these facts, is, that his stock of goods opened and on the shelves in his store amounted to between $8000 and $10,000; but that he had unopened stock in his ware-room, which ware-room was under the same roof as the store but divided off from the store proper by a partition, amounting, according to his "footing up," to use his expression, of duplicate bills exhibited to him at the trial, to $2832.64, that then these goods were not opened, not checked up, *and were never entered in his books*; that his reason for not entering the goods on his books, was because, to quote his language in answer to a question by the plaintiff's attorney :

"It is the custom of merchants in the country and particularly myself, never to enter bills of goods received until the goods are opened and checked up; for that reason these bills you have in front of you there never appeared upon my books, because the goods had never been opened and checked up; the bills were waiting until the goods were opened or I had them opened. * * * * These entries would not be made until the goods were opened and marked, then these goods would have gone into the books. * * *

217

\* \* \* After the goods would have been opened and checked up and taken into the general store credit for the amount would be given to the seller or shipper."

He further testifies that these unopened, unchecked and unentered goods had been received by him about a week or two before the fire, except a bill of Pollock & Bernheimer which he had drayed into his store the evening before the fire. On cross examination he says that some of these goods had been in his store "probably 30 days," since "about the 1st. of September." These unopened and unentered goods were also totally destroyed by the fire.

The circumstances attending the loss of the books are accounted for by him as follows : At about 6 o'clock or 6:30 o'clock of the evening preceding the fire, his clerks having all left and gone home, he was engaged at work on his books which he had taken out of his iron safe, and was using on his desk. Whilst at work on them he was taken ill with bilious colic, a complaint which he is subject to, that he at once closed his store leaving the books on the desk, and went to his home a short distance from the store, for the purpose of getting something to relieve his pain, his intention being to go back to the store; that he then took a dose of medicine which he kept on hand as a cure for such attacks and which contained chloroform, adding "I suppose I took too much chloroform; anyway, I fell asleep and did not wake up until the alarm of fire was given. I knew nothing more until I heard the alarm of fire that night." The usual hour for closing the store for business at that season of the year being 8 o'clock or 8:30 o'clock P. M.

The iron safe clause, which has universally been held to be a promissory warranty, specifically requires the insured to "keep a set of books which shall clearly and plainly present a complete record of business transacted, including all purchases, \* \* \* \* both for cash and credit, \* \* \* \*" and to "keep such books and inventories, \* \* \* \* securely locked in a fire-proof safe at night and at all times when the building mentioned in this policy is not actually open for business. or failing in this, the assured will keep such books and inventories in some secure place not exposed to fire. \* \* \* \*"

Notwithstanding, 1st., the failure of the insured, so far as concerns the goods in the ware-house, to enter such purchases in his books; and 2nd., his failure to have had his books in his iron safe, when the fire occurred at night and after the store had been closed for business, it is contended that the right to recover on the policy is not lost to him for as much, as, in the instance of the non-entry of the goods in the ware-house, he pursued the usage and custom of merchants in not entering goods purchased until they were opened and checked, which custom entered into and became part of the contract of insurance; and that in *both* instances, (whether as con-

218

cerns the non-entry of the goods and as to the absence from the iron safe of the commercial books,) the insured's course and conduct and the incidents attending these circumstances, evidence a *substantial* compliance with this promissory warranty; and that, as is held in some jurisdictions, and should be held in this, a *substantial*, and not a *strict* compliance is all that is necessary so far as concerns the promised line of conduct stipulated by this warranty. The view which we take of this case renders it unnecessary to discuss the question whether an express promissory warranty in a policy of insurance must be strictly complied with, or whether, as ably argued by the learned counsel for plaintiff, a *substantial* compliance is all that is necessary, because, in our appreciation of the evidence there has not been *even a substantial compliance* with the stipulations *supra.*

It may be conceded that usage and custom may be admitted to affect insurance contracts as is allowed in other contracts, the principle upon which evidence of same is received, is that the parties to the policy are supposed to have contracted with reference to it; but the rule of construction applicable to policies of insurance does not differ from that applied to other contracts. Its sense and meaning are to be ascertained from the terms of the policy taken in their plain and ordinary signification, unless such terms have, by the known usage of of trade, in respect to the subject matter, acquired a meaning different from the popular sense of the same terms, or unless the instrument itself, taken together, shows that they were understood in some particular manner; and whilst, however, the clear and explicit language of the contract may not be enlarged or restricted by proof of custom or usage, yet in the application of a contract to its subject matter, in bringing it to bear upon any particular object or expression, the customs and usages of trade are admissible to ascertain what subjects were within and what excluded from its operations.

Mr. Arnold in his work on Insurance summarizes the general rule relating to usages in insurance policies as follows : First, every usage of a particular trade which is well settled or so generally known that all persons engaged in that trade may be fairly considered as contracting with reference to it, is considered to form part of every policy designed to protect risks in such trade, unless the express terms of the policy decisively repel the inference. 2nd., the usage, in order to be binding, must be either a *general usage of the whole mercantile world*, or a particular usage of *universal notoriety* in the trade upon which, and of the place at which the insurance is effected. The usage of a particular place or a particular class of persons cannot be binding on non-residents or on any person, unless they are shown to have been cognizant of it. Sec. 43, and to this effect is 1 Peters 151, 8 Peters 557, 6 Mass. 477, 36 N. Y. 173, 55 N. Y. 129, 42 N. Y. 393, 5 Howard 744.

Applying these principles of law to the facts of this case we

219

find no usage or custom established which it can be said the parties to the policy were supposed to have contracted with reference to.

But three witnesses are examined as to the usage and custom set up by the plaintiff : the insured, (H. C. McCall) Jacob Katz and E. T. Worms, the latter two, merchants of the City of New Orleans.

McCall's testimony is that "it is the custom of merchants in the country and particularly (himself) myself never to enter bills of goods received until the goods are opened and checked up."

Katz' testimony is that it is the custom as soon as the invoice is received to "put it on file;" and that *as soon as the goods arrive* they are checked off from the invoices and are then entered on the books. "When the cases are received," he says, "it is reported to the office that such invoices have been received; they then check off the goods. If the goods are all in, he checks O K. on the bill and it is filed and entered."

Q. *As soon as the goods arrive* you examine them and check them against the invoice and pay the bill.

A. Yes, sir.

Worms says that he does not know what the general custom is·

Here we have the only two witnesses who testify as to usage differing as to it, and neither of them undertaking to say that the usage testified by either "is a general usage of the whole mercantile world or one of a "particular usage of universal notoriety in the trade upon which, and of the place at which the insurance is effected."

McCall says that the custom is never to enter bills until the goods are opened and checked "and taken with the general stock" implying at least, that this is the custom without regard to the length of time the merchant may keep his goods unopened and unchecked and "taken into the general stock."

Katz on the contrary says that *as soon as the goods are received* they are opened and checked and entered on the books.

McCall says that the custom he is testifying to is that "of merchants in the country" and "particularly (himself) myself."

Katz, (quite evident from his entire testimony.) is referring simply to the custom of his own house, and certainly not to any custom existing beyond the City of New Orleans.

This evidence falls far short of establishing any usage which answers the requirements of the law as cited above.

But pretermitting the question of the unsatisfactory character of the evidence as to the usage and assuming, for the argument, that the doctrine of substantial compliance obtains in this State which it must be understood we are not deciding, and that an insurer substantially complies with the second section of the iron safe clause *supra*, when he simply postpones the entering on his books of goods purchased by him which he has not opened or "checked

220

off," the question yet remains whether there is any compliance with this stipulation *at all, substantially* or otherwise, when the insurer allows weeks and even months to elapse after the receipt of the goods before "opening and checking them off" so that they may be entered in his books.

According to the duplicate invoices which McCall says represents the purchases of goods which he had in his ware-house, unopened and unchecked, and which according to our "footing up" amounts to $2121.41, it appears there is a bill of Keiffer Bros., New Orleans, La., $33.70. This bill on its face shows it to have been a *cash* bill and it is dated June 6th., 1901. The fire occurred between the night of the 2nd. and the morning of October 3rd., 1901. We take judicial cognizance of the fact that Wilson, La., where the insurer was doing business, is but a short distance from the City of New Orleans. Allowing one week for the transportation of the goods these goods must therefore have been in the ware-house, unopened and unchecked over three months before the fire.

Another is a bill of M. Frankel, New Orleans, for $160.00 dated June 1st., 1901.

Another is that of Pollock and Bernheimer, Mobile, Ala., for $358.72 dated July 18th., 1901, "terms 90 days or 10 days less 2 per cent or 30 days less 10 per cent." If McCall had not availed himself of the discount the bill on its face was due Sept. 11th., 1901, twenty one days before the fire and certainly must have been received by McCall within a reasonable delay after July 18, 1901. The other bills of that house are of subsequent dates. Another is a bill of S. E. Worms & Co., New Orleans, dated August 1st., 1901. Terms 1st. Nov., $166.57. This bill would have been due within twenty-nine days after the fire and yet the goods are unopened and unchecked according to the testimony. The other bills of the same house are dated Aug. 15th. and according to the testimony of S. E. Worms were shipped on the 9th. of September. Another is a bill of S. and J. Katz and Co. of New Orleans dated June 27th., for $24.89. Ibid $6.65, Ibid $140.84, Ibid July 16th., $5.75, Aug. 22, $9.75, Aug. 22, $21.00, Aug. 22, $46.45, Aug. 22, $154.12. The bill of June 27th. is a cash bill, so is that of July 16th. and so is that of Aug. 22 and yet these goods were unopened, unchecked and unentered. Katz testifies that the shipment of these goods were in two lots : "one part in *July* and one part in *August*; a day or two after the invoices was made up."

Thus it seems that goods bought for cash and received months before the fire were not opened and not entered on the books and that other bills bought and received one, two and three months before the fire were likewise unopened, unchecked and unentered. No excuse whatsoever is tendered for this delay in opening, checking and entering these goods except that the insurer was not ready "to take them into his general stock." This is no valid excuse. The failure to promptly open, check up and enter these goods was the

result of the insurer's negligence or design. There was not only no substantial compliance with the stipulation but it was, on the contrary, wilfully and inexcusably violated, and it is sufficient to avoid the policy.

Equally was it the fault and the result of negligence on the part of the insured that the books were left out of the safe after the store was closed for business. His excuse for leaving the store on the evening preceding the fire was that he was suddenly taken sick. It is not shown that his sickness was of such severity that although he was able to close up the store he could not have put up the books. But it is said by him that his intention was to return to the store after taking a dose of. medicine and that this is why the books were not then put in the safe. Admit, simply for the argument, and without being understood as holding that this is a valid excuse for non-compliance with the promissory warranty, it is to our thinking quite clear that his failure to return to the store before the fire and to put away the books, was the result again of the insurer's fault and negligence. He says that he "fell asleep and did not wake up until the alarm of fire." What caused him to go to sleep? He is not quite sure what was the cause. If he went naturally and deliberately to sleep he cannot make his deliberate action the excuse for the consequences that followed. He says, however, "*I suppose* I took too much chloroform." If this caused his sleep then the taking of the overdose was the result of his carelessness, imprudence and negligence. It was his own *fault* that prevented his return to the store and he may not be permitted to set up his own fault as an excuse for non-compliance with express warranties, even if the doctrine of substantial compliance be admitted, about which we repeat we are not presently expressing any opinion. We do not understand that the iron safe clause applies to the specific insurance of the store building and the fixtures, amounting together to $400, nor that it is so contended. To this extent the plaintiff may recover, but as to the insurance on the stock of merchandise the non-compliance with the promissory warranty defeats that claim, and the judgment appealed from must be accordingly amended.

It is therefore ordered, adjudged and decreed that the judgment appealed from be and the same is hereby amended by reducing the amount thereof from nineteen hundred dollars to four hundred dollars and as thus amended the judgment is affirmed; the costs of appeal to be taxed against the appellee.

May 16, 1904.

ON APPLICATION FOR REHEARING.

A policy of fire insurance covering various classes of property describing it separately as per example: first, the store building; second, the stock of merchandise, and third, the store fixtures; and specifying separate amounts on each class, is not avoided by a breach of the iron safe clause as to any property included

222

in the contract, except that covered by the forfeiture clause which in this case is that which was required to be inventoried and a record made of the business concerning which books of accounts were required to be kept, to wit: the stock of merchandise.

2. The general rule "void in part void in toto" applies only to cases where the contract is affected by some all-pervading vice, such as fraud, or false swearing or some unlawful act condemned by public policy, or where at least the policy in plain and explicit language provides for a forfeiture of the whole policy in the event of non-compliance with all or with some particular stipulation or warranty.

MOORE, J.   Both the appellant and the appellee ask to have this cause reheard; the latter on the ground that we erred in our finding of facts, and the former because, having found that the iron safe clause had been violated the avoidance of the entire policy followed, and that we should have so decreed.

A re-examination of the record but affirms our conclusion as to the facts and the appellee's (plaintiff's) application is denied.

We will likewise deny appellant's (defendant's) application, but forasmuch as it was not argued at the hearing that a violation of the iron safe clause carried with it the avoidance of the entire property we assumed that there was no contest as to the plaintiff's right to recover for the building and for the fixtures, and, therefore we did not discuss the matter, nor cite authorities in support of the views which we entertained contrary to appellant's present contention on that proposition.

It is but proper that we should do so now.

The policy, as shown in our former opinion, covers various classes of property, separately described and specifying separate amounts of indemnity on each class.

The policy is for $1900, but the property covered and its location are not specified in the policy proper, but appear in a printed form or slip attached thereto.

The policy, proper, declares that the property insured is "as per form attached."   The form attached is as follows:

"MERCANTILE FORM."

$1500 00 on his stock of merchandise consisting of general merchandise, and such other merchandise, not more hazardous, usual to his trade, while contained in the one story frame building with iron roof, situated Southeast corner Sycamore and Grant streets, in the town of Wilson, La.

$ 300 00 On the above building, occupied as a general merchandise store.

$ 100 00 On store fixtures and furniture including one iron safe contained in the above described building.

$1900 00

223

"This insurance is effected subject to the following conditions:" Then follow the usual "three-fourths value clause," the "iron safe clause," the "electric light permit," the "concurrent insurance permit," allowing further insurance of $2000.00 on stock, $300.00 on building and $100.00 on store furniture and fixtures.

The terms of the iron safe clause are set out in extenso in our former opinion. In our opinion the purpose of incorporating the conditions of that "clause" is patent from its language. That it was never within the contemplation of the parties that the books and inventory were to contain any item with reference to the building of fixtures is beyond cavil.

The preservation of them was solely and exclusively for the purpose of ascertaining the value of the stock covered by the policy in case of fire. They were the best evidence of this fact, and, if correctly kept would furnish an unerring guide by which the amount of the insurer's liability as to the goods destroyed could have been ascertained. Besides they stood as a barrier to the perpetration of any fraud by the assured with respect to the quantum and value of the goods destroyed. No such considerations could be invoked as to the application of this condition to the other subjects of insurance in the policy. Nor can it be fairly said that this condition entered into the inducement on the part of the defendant to issue the policy. It was not shown that the rate of insurance upon the house and fixtures would have been greater had the assured not included his stock of goods in the policy or that a different rate was charged upon the separate valuation of each subject.

Every one knows that when policies are issued which do not cover merchandise the "iron safe clause" is not attached, because it would be of no benefit whatever to either party to the contract.

As we have said there is nothing in the language of this clause that would indicate that it was the intention of the parties to include in the forfeiture anything but the stock of goods. "The assured shall take a complete itemized inventory of stock on hand" is the language of this clause in reference to the inventory. The building and the fixtures surely can not be considered 'stock on hand.' As to the books to be kept the requirement is that they shall present a complete record of business transacted, including all purchases, sales and shipments both for cash and credit."

The character of the assured's business is not that of dealing in real estate. He is described as conducting a "general merchandise" establishment, hence the "purchases, sales and shipments," which the clause requires him to "clearly and plainly present" by the record thereof in his books, clearly refer to that which the nature and character of his business alone indicates he "purchases, sells and ships," to wit: "general merchandise."

These considerations coupled with the policy of the law that forfeitures are not favored, have influenced the Courts, whenever this particular question has arisen, id est the effect of the breach of

224.

the iron safe clause as to other property covered except the stock, to hold the policy to be severable when it covers, as in this case, different classes of property and in which there is a distinct and separate amount placed upon each separate class. Hanover Fire Insurance Co. vs. Crawford 121 Ala. (25 S. R. 912) Mitchell vs. Miss Home Insurance Co. 18 S. W. 86; Roberts vs. Sun Mutual Insurance Co. 35 S. W. 955; Sun Mutual Insurance Co. vs. Tuffts 50 S. W. 180; Miller vs. Delaware Insurance Co. 75 Pacific R. 1121, and cases cited in latter.

This case, and those holding views similar to those expressed by us on this particular character of policy and as concerning the particular clause referred to, must not be confounded with those in which the general rule has been enforced : "void in part, void in toto." This rule is only applied where the contract is affected by some *all-pervading vice*, such as fraud, or false swearing or some unlawful act condemned by public policy, or where at least the policy in plain and explicit language provides for a forfeiture of the whole policy in the event of non-compliance with all or with some particular stipulation or warranty. It is said that Germier vs. Springfield Fire and Marine Insurance Co. 109 La. 343 hatches a different doctrine. We do not so read the decision. In our opinion it is in full accord with what we have just stated to be character of cases to which the rule "void in part void in toto" applies. In that case *an all-pervading vice was present*, to wit: *concealment and misrepresentation of a material fact;* and in the next place, the policy in plain and explicit language provided that the *entire policy* shall be void if there be either concealment or misrepresentation on the part of the assured. The clause reads as follows: "This *entire policy* shall be void if the assured has *concealed or misrepresented* in writing or otherwise any material fact or circumstance concerning this insurance, etc." The Court found that the insured had concealed and misrepresented material facts connected with the insurance and under the doctrine of "all pervading vice" and in view of the plain and specific language of the policy providing for a forfeiture of the *entire* policy, forfeited it in its entirety.

In the instant case there is no all pervading vice, nor is there any stipulation in the iron safe clause in plain and specific language providing for the forfeiture of the *entire* policy in the event of a breach of the iron safe clause.

Rehearing refused June 18, 1904.

Writ of review refused by Supreme Court July 29, 1904.